**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

DEFENDERS OF WILDLIFE
1130 17th Street NW
Washington, D.C. 20036, and
THE SIERRA CLUB
85 Second Street, 2d Floor
San Francisco, CA 94105-3411,

Plaintiffs,

v.

LISA P. JACKSON, in her official capacity as Administrator, United States Environmental Protection Agency,

Defendant.

No. ____________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. Coal-fired power plants are the nation's biggest water polluters. In 2008 alone, more than 650 power plants in the United States discharged more than two million pounds of toxic metals and metal compounds such as arsenic, boron, cadmium, chromium, lead, mercury, and selenium. The Environmental Protection Agency ("EPA") has reported coal plant discharges with mercury concentrations that are nearly nine hundred times higher than the maximum contaminant levels deemed safe by the agency and selenium concentrations four thousand times higher than water quality standards set to protect fisheries and other aquatic life.

2. These toxic discharges are associated with the disposal of coal combustion wastes ("CCW"), principally coal ash and the sludge from flue gas desulfurization ("FGD") systems that are installed to control air pollution. Over the past 20 years, growing use of FGD "scrubber" systems has increased exponentially the amount of toxic metals discharged from power plants,

and pollution is expected to become significantly worse as installation of scrubbers increases by a projected 28 percent over the next 15 years.

3. Despite the gravity and scope of this pollution problem, EPA never has set national standards to limit toxic metals discharges from power plants. Indeed, EPA has failed to revise the effluent limitations and effluent limitations guidelines ("ELGs") applicable to power plants for 28 years, despite the repeated acknowledgement that the existing effluent limitations and ELGs have not kept pace with the installation of FGD systems and other developments in the electric utility industry.

4. With this action, Plaintiffs Defenders of Wildlife and The Sierra Club seek to compel the expeditious promulgation of long overdue regulations governing wastewater discharges from power plants as the Federal Water Pollution Control Act ("Clean Water Act") requires.

## JURISDICTION

5. This action arises under the citizen suit provision of the Clean Water Act. 33 U.S.C. § 1365(a)(2).

6. This Court has jurisdiction over this action pursuant to 33 U.S.C. § 1365(a), as well as 28 U.S.C. §§ 1331 and 1361, and may issue a declaratory judgment and grant further relief pursuant to 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201 and 2202.

7. Plaintiffs have a right to bring this action pursuant to 33 U.S.C. § 1365(a)(2) and the Administrative Procedure Act, 5 U.S.C. §§ 701 to 706.

8. By certified letter posted November 6, 2009, as well as via messenger and email, Plaintiffs gave notice to defendant of the violations alleged herein and have thereby complied

with the 60-day notice requirement of the Clean Water Act's citizen suit provision. *See* 33 U.S.C. § 1365(b)(2). *See* Exhibit A.

**PARTIES**

9. Plaintiff Defenders of Wildlife ("Defenders") is a Washington D.C.-based, nonprofit membership organization dedicated to the protection of all native animals and plants in their natural communities. Defenders has more than 530,000 members across the nation.

10. Plaintiff The Sierra Club was founded in 1892 and is the nation's oldest grass-roots environmental organization. The Sierra Club is a nonprofit, membership organization incorporated in California with more than 700,000 members in all 50 states and the District of Columbia. The Sierra Club's purpose is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments.

11. Members of both Defenders and The Sierra Club live near coal-fired power plants that discharge wastewater that is inadequately regulated by EPA's outdated effluent limitations and ELGs in the Steam Electric Power Generating category. Members of both groups drink water that is polluted with toxic metals such as arsenic and lead that are discharged from power plants. Members of both groups fish in lakes and streams polluted by power plant wastewaters that are laced with selenium and other bioaccumulative metals such as mercury and cadmium, and they routinely use waters downstream from power plant outfalls for boating and other forms of recreation. EPA's failure to set effluent limits on toxic metals discharges from power plants has increased the exposure of members of both groups to highly toxic pollutants and further

injured their aesthetic, recreational, educational, and conservation interests in protecting water quality in rivers and streams across the country.

12. Defendant Jackson is the Administrator of the EPA and in that role is charged with the duty to promulgate regulations according to the schedules set forth in the Clean Water Act.

## LEGAL BACKGROUND

13. Congress passed the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act protects all waters of the United States, including surface waters that supply drinking water, support fish and wildlife, and provide aesthetic and recreational opportunities for current and future generations of Americans.

14. The Clean Water Act's goal is to eliminate all discharges of pollution into navigable waters. *Id.* § 1251(a)(1). To achieve this goal, the Act requires that EPA to set effluent limitations based on the "best available technology economically achievable" ("BAT") for pollutants including toxic metals. *Id.* §§ 1311(b)(2)(A)-(F), 1314(a)(4).

15. To facilitate the adoption and revision of effluent limitations, the Act also requires that EPA develop and publish "effluent limitation guidelines" ("ELGs") that characterize the effluent discharges from a given industry, identify the level of pollution control that is possible in light of available technologies, and specify the relevant factors for determining what constitutes BAT. *Id.* § 1314(b).

16. To ensure that governing regulations reflect advances in control technology, the Clean Water Act requires EPA to review and, if appropriate, revise these effluent limitations and underlying ELGs at regular intervals. *See id.* §§ 1311(d), 1314(b). Section 301(d) of the Clean

Water Act requires that all effluent limitations "*shall* be reviewed at least every five years, and, if appropriate, revised . . . ." *Id.* § 1311(d) (emphasis added). Similarly, with respect to ELGs, section 304(b) of Clean Water Act requires that "the Administrator *shall* . . . publish . . . regulations, providing guidelines for effluent limitations, and, at least annually thereafter, revise, if appropriate, such regulations." *Id.* § 1314(b) (emphasis added).

17. Sections 301(d) and 304(b) impose mandatory obligations on EPA to take action within the statutory deadlines. EPA cannot skirt its statutory responsibilities and instead either must (1) make a determination that revision and new regulations are not appropriate, or (2) make a determination that revision is appropriate and issue revised regulations within the statutory deadlines. Under section 301(d), EPA must perform this duty every five years. *Id.* § 1311(d). Under section 304(b), EPA must perform this duty annually. *Id.* § 1314(b).

18. For the past three decades, EPA has combined the process of setting effluent limitations and ELGs, addressing its obligations under 301(d) and 304(b) simultaneously by promulgating ELGs that include effluent limitations. *See* 73 Fed. Reg. 53218, 53221 (Sept. 15, 2008). While EPA may address its obligations under 301(d) and 304(b) in a single process, the agency still must comply with the statutory deadlines governing both ELGs and enforceable effluent limitations. This statutory deadline scheme is essential to ensure that all ELGs and effluent limitations "remain current with the state of the industry and with available control technologies." 63 Fed. Reg. 29,203, 29,204 (May 28, 1998).

**FACTUAL BACKGROUND**

19. Despite acknowledging that fundamental changes in the steam electric power industry have caused a tremendous increase in the amount of pollution discharged from power

plants over the past several decades, EPA has failed to revise the effluent limitations and ELGs in the Steam Electric Power Generating category for over 28 years.

20. Power plants produce more toxic waste than any other industry in the United States, including the chemical, plastic, and paint manufacturing industries that historically have caused the greatest harm to our nation's waters. Of the 1,200 nuclear and fossil-fuel power plants operating nationwide, the existing coal-fired fleet or approximately 673 plants are among the most polluting.

21. According to EPA, coal-fired power plants generate approximately 130 million tons of coal ash, scrubber sludge, and other combustion residues annually. In 2008 alone, coal-fired power plants discharged more than two million pounds of metals and metal compounds into surrounding waters. Notably, this figure does not account for additional pollution caused by the catastrophic failure of the Tennessee Valley Authority's ("TVA") Kingston Fossil Plant, which spilled one billion gallons of CCW into the Emory and Clinch Rivers in December, 2008. Since toxic metals discharges from power plants currently are not regulated by EPA, and since these discharges are not routinely monitored or reported at many power plants, the actual volume discharged may well be significantly higher.

22. Wastewaters discharged from FGD systems or "scrubbers" are principal contributors to the high volume of toxic pollutants discharged from power plants. While scrubbers dramatically reduce emissions of harmful pollutants into the air, they create a new liquid waste stream that is ridden with the toxic pollutants that otherwise would have exited the stack.

23. The use of scrubbers at coal-fired power plants has increased dramatically since 1977, when only five percent of plants had installed scrubbers to control air pollution. As of

2009, 50 percent of the coal-fired power plants in the United States had incorporated scrubber systems, and EPA expects this number to increase to 66 percent in 2015 and 78 percent in 2025. As EPA has acknowledged, this dramatic rise in scrubber use is significantly increasing water pollution.

24. The other major wastewater streams from coal plants are produced by coal ash handling and disposal systems, which often are comprised of nothing more than rudimentary "settling" ponds that pipe wastewater directly into a receiving stream or river.

25. Combusting coal in steam electric boilers creates coal ash in solid form that is mixed with water and transported out of the boiler in liquid form. This wastewater is called "fly ash transport water" when the coal ash is fine enough to be transferred out of the boiler with the flue gas exhaust, and it is called "bottom ash transport water" when it contains the heavy bottom ash particulates that are byproducts of the coal combustion process. Recent data compiled by EPA indicates that up to 14 million gallons of fly ash transport water and up to 6.6 *billion* gallons of bottom ash transport water may be generated at just one power plant in any given year. This incredibly large volume of wastewater typically is "treated" in large settling ponds — essentially large unlined pits where wastewater is held until the relatively heavy solids settle to the bottom of the pit. EPA has recognized that settling ponds are "not effective at removing dissolved metals," meaning that any dissolved metals in fly ash and bottom ash transport waters do not "settle" and instead are discharged from settling ponds into surrounding waters.

26. Toxic metals pollution also occurs when leachate systems for landfills and ash impoundments discharge untreated or inadequately treated wastewaters. In addition, leaks, seeps, and other failures in ash ponds, surface impoundments, and landfills allow CCW-

contaminated water to drain into rivers and streams and ground water that is hydrologically connected to surface water.

27. EPA has identified 41 heavy metals and other polluting substances as "potential constituents of concern" in CCW and FGD wastewaters. These constituents are: Aluminum, Antimony, Arsenic, Barium, Beryllium, Boron, Cadmium, Chromium, Cobalt, Copper, Iron, Lead, Magnesium, Manganese, Mercury, Molybdenum, Nickel, Selenium, Silver, Strontium, Thallium, Vanadium, Zinc, Chloride, Cyanide, Fluoride, Total Nitrate Nitrogen, Phosphate, Silicon, Sulfate, Sulfide, Ammonia, Calcium, pH, Potassium, Sodium, Inorganic Carbon, Total Elemental Sulfur, Total Dissolved Solids, Total Organic Carbon, and Dissolved Organic Carbon.

28. Many of these toxic metals pose serious health risks even in very low concentrations. Selenium, for example, is a bioaccumulative pollutant that is harmful to freshwater fish and other aquatic life at levels as low as five micrograms per liter. Selenium at more elevated levels impedes the growth and survival of juvenile fish, and offspring of adult fish that were exposed to excessive selenium suffer skeletal deformities. Releasing selenium into rivers and lakes can decimate fish populations and make the surviving species unsafe to eat. In humans, exposure to selenium can cause hair and fingernail loss, numbness in extremities, and problems with circulation.

29. Like selenium, mercury is a bioaccumulative pollutant that poses significant risks to humans and wildlife. Mercury serves no beneficial physiological function in humans and is generally considered dangerous at levels above one microgram per liter. Exposure to mercury in pregnant women can cause serious damage to the brain and nervous system of the developing fetus, and children exposed to mercury can suffer from impaired nervous systems as well as pulmonary and nephritic damage. Adults exposed to elevated levels of mercury can experience

impairment of peripheral vision; disturbances in sensations ("pins and needles" usually in the hands, feet, and around the mouth); lack of coordination of movements; impairment of speech, hearing, and walking; and muscle weakness. In fish, mercury disrupts the endocrine system, impedes growth and development, and reduces fertility and survival.

30.    Other metals present in CCW effluents pose additional risks to humans and freshwater fish. Cadmium exposure can result in diarrhea, stomach pains, severe vomiting, bone fracture, adverse reproductive effects, nerve damage, and immune system damage in humans; and one microgram per liter of cadmium is enough to kill sensitive species such as rainbow trout. Arsenic is a known human carcinogen that causes cancer of the skin, bladder, and lungs. Ingestion of barium may result in serious toxic effects to the heart, blood vessels and nerves, and ingestion of uranium may result in damage to the kidneys. Boron exposure can cause stomach, intestinal, kidney, liver, and brain damage, negative effects on male reproduction, and even death. Chromium is a known carcinogen, and may also cause irritation and ulcers of the stomach and small intestine, sperm damage, and skin ulcers.

31.    Total Dissolved Solids ("TDS") is a catch-all category of pollution that includes common chemical salts, such as sulfates and chlorides, as well as dissolved metals such as arsenic, aluminum, barium, cadmium, copper, and manganese. Because many of the specific pollutants in TDS pose a variety of health hazards, EPA's recommended maximum concentration of TDS in drinking water is 500 milligrams per liter, and TDS levels in excess of 1,000 milligrams per liter are considered unfit for human consumption. High TDS concentrations are especially harmful to spawning fishes and juveniles. For instance, TDS levels of just 350 milligrams per liter reduce spawning of striped bass, and TDS levels of 5,600 milligrams per liter are lethal to minnow species.

32. EPA has determined that FGD wastewater contains significant concentrations of chlorides, TDS, nutrients, and metals, including bioaccumulative pollutants such as arsenic, mercury, and selenium. Sampling recently conducted by EPA indicates that selenium was present in FGD scrubber purge at concentrations up to 21,700 micrograms per liter. Mercury was present in sampled wastewaters at concentrations up to 872 micrograms per liter; arsenic was present at concentrations up to 5,070 micrograms per liter, and cadmium was present at concentrations up to 302 micrograms per liter. Eighteen other metals, including barium, chromium, lead, manganese, and uranium, were identified at similarly high concentrations. TDS was present at concentrations up to 26,000 milligrams per liter.

33. EPA also has determined that fly ash and bottom ash transport waters contain significant levels of dissolved metals, such as arsenic, magnesium, and selenium. Data gathered from TVA's Widows Creek Fossil Plant, a plant that spilled 10,000 gallons of slurry from its ash pond into the Tennessee River in January, 2009, showed arsenic concentrations at 46.0 micrograms per liter, magnesium concentrations at 7,110 micrograms per liter, and selenium concentrations at 26.8 micrograms per liter.

34. Notwithstanding the wealth of data revealing high metal concentrations in CCW wastewaters, there are no national standards regulating any of the toxic metals routinely discharged in CCW effluent. The current effluent limitations that apply to Steam Electric Power Generators were promulgated in 1982 and limit only the following parameters: (1) pH and PCBs (for all waste streams), (2) total suspended solids ("TSS") (for all waste streams aside from cooling tower blowdown wastes), (3) oil and grease (for all waste streams aside from cooling tower blowdown and coal pile runoff), (4) chlorine, chromium, and zinc, in addition to 126 pollutants contained in chemicals added for cooling tower maintenance (for cooling tower

blowdown waste streams only), and (5) copper and iron (for metal cleaning wastes and chemical and non-chemical waste streams only). *See* 40 C.F.R. §§ 423.12, 423.13. Since the effluent limitations and ELGs were first set in 1982, EPA has never undertaken revisions to address any of the metals in CCW wastewaters.

35. Yet EPA has acknowledged repeatedly that its 1982 regulations are inadequate. Even in 1982, EPA recognized that its effluent limitations did not limit wastewaters from FGD systems. *See* 47 Fed. Reg. 52,290-01 (Nov. 19, 1982) ("reserving effluent limitations for four types of wastewaters for future rulemaking" including "[f]lue gas desulfurization waters"). In 1994, and again in 1996 and 1998, EPA identified the Steam Electric Power Generating category for future rulemaking and indicated that a preliminary study of discharges from this category was necessary. In 2003, EPA identified the Steam Electric Power Generating category as having a "relatively high estimate of potential hazard or risk" and stated that EPA would "continue investigating pollutant discharges" from this category. Still, EPA declined to make any formal determination that revisions of the governing effluent limitations and ELGs would be appropriate.

36. In 2006, EPA acknowledged that the Steam Electric Power Generating category ranked second in discharges of toxic and nonconventional pollutants and anticipated that this category would produce "greater amounts of nitrogen compounds, selenium, and other metals in steam electric wastewaters as a result of the increasing use of air pollution controls." In 2007, EPA again concluded that the Steam Electric Power Generating category was the second-largest discharger of toxic pollutants and that the toxicity of these discharges was primarily driven by metals associated with CCW handling and scrubber waste. In 2008, EPA yet again acknowledged that scrubber wastewater "contains significant concentrations of chloride, total

dissolved solids (TDS), nutrients, and metals, including bioaccumulative metals such as arsenic, mercury, and selenium."

37.     Yet even as EPA acknowledged, year after year, the risks posed by CCW wastewaters, it never took any action to revise the governing effluent limitations and guidelines to reduce these hazardous discharges.

38.     Frustrated by EPA's inaction, many environmental groups and concerned citizens called upon EPA to comply with its duties under the Clean Water Act and issue revised regulations governing toxic metals discharges from power plants. As of July 27, 2009, 39 environmental and citizens groups had written to EPA and repeatedly requested that the agency issue new ELGs and effluent limitations to curtail toxic discharges from all CCW effluent sources.

39.     In light of EPA's continued failure to act, Defenders and The Sierra Club issued a notice of intent to sue EPA for failure to comply with its statutory duties under sections 301(d) and 304(b) of the Clean Water Act on September 14, 2009. In response to this letter, on September 15, 2009, EPA issued a press release stating that it "plan[ned] to revise the existing standards for water discharges from coal-fired power plants to reduce pollution and better protect America's water." On October 29, 2009, EPA published a proposal to survey industry regarding discharges of concern for purposes of a future rule-making. As explained by the agency, "EPA's review of wastewater discharges from power plants, and the treatment technologies available to reduce pollutant discharges, has indicated the need to update the current national effluent guidelines regulations." 74 Fed. Reg. 55,837, 55,839 (Oct. 29, 2009). EPA made clear that its "decision to revise the current effluent guidelines is largely driven by the high level of toxic-

weighted pollutant discharges from power plants and the expectation that these discharges will increase significantly in the next few years as new pollution controls are installed." *Id.*

40. Notwithstanding EPA's acknowledgment that the ELGs and effluent limitations in the Steam Electric Power Generating category are sorely in need of revision, and notwithstanding the fact that EPA repeatedly has missed the statutory deadlines in Clean Water Act sections 301(d) and 304(b), EPA has declined to commit to an expeditious timeline for issuing the revised regulations. Instead, EPA informally has advised Plaintiff groups that it intends to publish revised regulations over four years from now in mid-2014.

41. EPA's delay in revising the ELGs and setting effective effluent limitations has serious consequences. At present, coal-fired power plants collectively discharge two million pounds of toxic metals every year. Between now and 2015, the volume of toxic pollution from coal plant discharges will only grow, as EPA estimates that the total scrubbed capacity of coal-fired power plants will increase by 16 percent.

## CAUSE OF ACTION

42. Plaintiffs reallege and incorporate paragraphs 1 through 41.

43. It defies the most fundamental purpose of the Clean Water Act to leave water pollution from coal-fired power plants essentially unregulated for over 28 years — and now to defer regulation that EPA belatedly concedes is desperately needed. EPA's longstanding failure to complete a review of the effluent limitations and ELGs in the Steam Electric Power Generating category and revise the regulations accordingly pursuant to sections 301(d) and 304(b) of the Clean Water Act constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of 33 U.S.C. § 1365(a)(2).

44. EPA itself has acknowledged that new regulations in the Steam Electric Power Generating category are warranted. For decades, EPA has known that unregulated wastewater streams from scrubbers, ash ponds, and other ash handling and disposal systems contain toxic pollutants in harmful concentrations. Nonetheless, EPA declined year after year to make the required determination that revision of the effluent limitations and ELGs was appropriate and to undertake the necessary revisions. As a result, EPA failed to fulfill its rule-making obligations under sections 301(d) and 304(b) of the Clean Water Act. *See id.* §§ 1311(d), 1314(b).

45. Because EPA repeatedly has failed to meet the mandatory statutory deadlines set forth in sections 301(d) and 304(b), EPA must exercise the utmost diligence to comply with the Clean Water Act and issue revised effluent limitations and ELGs in the Steam Electric Power Generating category as expeditiously as possible.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

1. Declare that Defendant Jackson's agency has violated the Clean Water Act in repeatedly failing to meet the statutory deadlines for making the requisite determination that revision of the effluent limitations and ELGs in the Steam Electric Power Generating category is appropriate and revising the regulations accordingly;

2. Order Defendant Jackson to issue revised regulations in accordance with sections 304(b) and 301(d) of the Clean Water Act;

3. Retain jurisdiction of this action to ensure compliance with its decree;

4. Award plaintiffs the costs of this action, including attorney's fees; and

5. Grant such other relief as the Court deems just and proper.

DATED: November 8, 2010

Respectfully submitted,

Jennifer S. Peterson
Jennifer S. Peterson, Bar. No. 978352
Environmental Integrity Project
One Thomas Circle, Suite 900
Washington, DC 20005
(202) 263-4449
jpeterson@environmentalintegrity.org

Abigail Dillen / jsp
Abigail M. Dillen
Megan Klein
Earthjustice
156 William Street, Suite 800
New York, NY 10038
(212) 791-1881
adillen@earthjustice.org

*Attorneys for Defenders of Wildlife and the Sierra Club*